**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Jeffrey E. Johnson, Shoshanah Johnson, | |
| *Plaintiffs,* | 2:14-cv-6517 |
| - VS - | |
| Marriott International Incorporated, J.W. "Bill" Marriott Jr., Chairman, Arne Sorenson,  Edward Ryan, William Dempster, Ken Capone, The Briad Group, Brad Honigfeld, David DeCicco, Susan Fierrros, Donald Urbanski, Eric and Lisa Wohlrab and  John and Jane Does 1-20 Inclusive, | DEMAND FOR JURY TRIAL |
| *Defendants.* | |

Plaintiffs Jeffrey E. Johnson and Shoshanah Johnson (hereinafter "Johnsons" or "plaintiffs"), as and for their complaint against defendants herein, allege and say:

## JURISDICTION AND VENUE

1       Jurisdiction of this Court is proper under 28 USC 1332 (a)  because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States."

2.       Venue is proper under 28 USC 1391: "A civil action may be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated;"

3.       All acts giving rise to this action accrued in Suffolk County New York.

1

INTRODUCTION

4.      This action seeks money damages for the loss of the Johnsons' beloved companion animal, Cotton, a female cat, and the emotional distress upon Plaintiffs intentionally and deliberately inflicted by Defendants.

5.      This action seeks money and punitive damages for the abuse Cotton suffered because of defendants' actions when she was under the care and control of defendants.

6.      This action seeks punitive damages for the defendants' consistent efforts to conceal all information regarding Cotton's whereabouts and condition and, to date, have failed in their corporate duty to disclose any information and efforts made to find and secure Cotton.


THE PARTIES

7.      At all times material to this suit plaintiffs Jeffrey and Shoshanah Johnson are citizens of the United States domiciled in Fowlerville and Detroit, Michigan, who owned a female cat companion animal named Cotton.

8.      At all times material to this suit defendant Marriott International Corporation is a corporation doing business in New York State.  Marriott International is the parent corporation of Residence Inn by Marriott. Marriott International has an address of 10400 Fernwood Road, Bethesda, Maryland, 20817 and is incorporated in the State of Delaware.

9.      At all times material to this suit defendant Residence Inn by Marriott ("Residence Inn") located at Residence Inn, Islip, Long Island, Courthouse Complex, 7 Court House Drive, Central Islip, New York, were parties to a contract to provide hotel services to plaintiffs.

10.     Defendant J. W. Marriott, Jr. was the Executive Chairman of Marriott and personally oversees the worldwide operations of his company. Defendant Marriott has personal knowledge

of the events enumerated within this complaint.  Defendant Marriott works in Maryland at 10400 Fernwood Road, Bethesda, MD 20817.

11.     Defendant Arne Sorenson ('Sorenson") at all times material to this suit was Chief Executive Officer of Residence Inn by Marriott and has an address of 10400 Fernwood Road, Bethesda, MD 20817 and knowingly participated in the scheme to conceal the whereabouts of Cotton.

12.     Defendant William Dempster is the Global Compliance Counsel of Marriott and has an address at Marriott International, Inc. Law Department 52.923.23; 10400 Fernwood Road, Bethesda, Maryland 20817 office 301.380.8414; cell 301.346.6406. Defendant Dempster has personal knowledge of the events enumerated in this complaint and knowingly participated in the scheme to conceal the whereabouts of Cotton.

13.     Defendant Ken Capone is Vice President of Select Service & Extended Stay Franchising Operations for Marriott and has an address of 10400 Fernwood Road, Bethesda, MD 20817. Defendant Capone has personal knowledge of the events enumerated in this complaint and knowingly participated in the scheme to conceal the whereabouts of Cotton.

14.     Defendant The Briad Group is a LLC which does business in New York and New Jersey, and elsewhere and has an address listed as 78 Okner Parkway Livingston NJ 07039, tel. 973.597.6433; Fax 973.597.6422.  At all times relevant to this suit defendant 15.   The Briad Group, LLC ("Residence Inn" or "Briad"), a domestic corporation doing business in the State of New York, domiciled in Livingston, New Jersey, owned the franchise of Residence Inn by Marriott.

15.     At all times relevant to this suit defendant Briad Lodging Group, LLC, Central Islip, ("Residence Inn" or "Briad") a foreign domestic company registered in Las Vegas, Nevada, doing business in the State of New York, owned the franchise of Residence Inn by Marriott.

16.     At all times relevant to this suit defendant Bradford Honigfeld ("Honigfeld") was the Chief Executive Officer of the Briad Group and knowingly participated in the scheme to conceal the whereabouts of Cotton.

17.     At all times relevant to this suit defendant David DeCicco ("DeCicco") was the Vice President of the Hotel Division of Briad Group and has personal knowledge of the events enumerated in this complaint and knowingly participated in the scheme to conceal the whereabouts of Cotton.

18.     At all times relevant to this suit defendant Susan Fierros ("Fierros") was the General Manager of the Residence Inn by Marriott located at Islip, Long Island, Courthouse Complex, 7 Court House Drive, Central Islip, New York. Fierros knowingly participated in the scheme to conceal the whereabouts of Cotton.

19.     At all times relevant to this suit defendant Kerri Leigh Black ("Black") was Operations Manager of the Residence Inn by Marriott located at Islip, Long Island, Courthouse Complex, 7 Court House Drive, Central Islip, New York and knowingly participated in the many events enumerated herein that gave rise to the scheme to conceal the whereabouts of Cotton.

20.     Defendant Donald Urbanski ("Urbanski") who at all times relevant to this complaint resided at 367 Wildwood Road, Ronkonkoma, New York, was the boyfriend of Black and knowingly participated in the events that that gave rise to the scheme to conceal the location of the female cat companion animal, Cotton.

4

21.    Defendants Eric and Lisa Wohlrab, the owners of the residence at 367 Wildwood Road, Ronkonkoma, New York, where defendants Urbanski and Black were domiciled, knowingly participated in the events that that gave rise to the scheme to conceal the whereabouts of Cotton.

22.    This complaint reserves the right to name liable parties, defendants DOES, if any, who cannot be ascertained at this time and who will be joined as parties if and when their names and actions are ascertained.


FACTS

23.    Plaintiffs Jeffrey and Shoshanah Johnson are citizens of the United States of America and last lived in Fowlerville, Michigan. Plaintiffs currently reside in Had Nes, Israel.

24.    Defendants designated herein as DOES 1-20 are responsible in some manner and liable herein by reason of wrongful and unlawful conduct which proximately caused the injuries and damages to Plaintiffs as herein alleged.

25.    At all times mentioned, all Defendants and each of them, were agents and employees of all other Defendants, and in doing the things hereinafter alleged were acting within the course and scope of their authority as such agents and employees and with the consent and ratification of all other Defendants.

26.    The acts complained of herein took place in Suffolk County, New York.
This court is the proper court in which to file suit because the injuries to person and damage to personal property occurred in its jurisdictional area.

27.    Plaintiffs are the owners of a two year-old female feline companion animal, of particular value, named Cotton. Cotton has an International Microchip No. 985112003451332.

28.     On or about June 10, 2014, plaintiff Jeffrey Johnson made a reservation for a two night stay at the Residence Inn by Marriott, from July 14, 2014 through July 16, 2014. Plaintiff used his Silver Awards Membership with Marriott to make this reservation. On or about July 11, 2014, plaintiff specifically arranged a ground level suite to accommodate their companion animals.

29.     Defendants' stated and widely publicized pet policy is to accommodate guests with companion animals. *See* Exhibit A.

30.     On July 14, 2014, the Johnsons checked in at the Residence Inn and the staff assisted with the transfer of the pets to the room.

31.     On July 16, 2014 while preparing for their departure they could not find Cotton and continued to search everywhere in the room. During their search they requested help from the Residence staff, and someone was sent to their room. They searched for Cotton under the bed, in the coil springs of the bed, underneath and behind all of the furniture, in the closets, vents, etc., and could not find her anywhere.

32.     The Johnsons then received a request from their airline, El Al, to arrive at JFK earlier then they had been scheduled, which forced them to leave before Cotton was found.

33.     Upon departing from the Residence Inn, the Johnsons left Cotton's carrier, her picture, her microchip details and a shirt worn by Jeffrey to attract Cotton by his scent. They left instructions on how to handle Cotton, who is very shy, and to take her to a local veterinarian where the U.S.D.A. and El Al were to be notified to prepare to transfer Cotton to an El Al flight from JFK to Tel Aviv. The Johnsons agreed to pay all fees and costs in connection with the transfer of Cotton.

34.     On July 19, 2014, Johnson received an e-mail from the Residence Inn that Cotton had been found in the room, then occupied by another guest, and that they would charge him for the room.

35.     The Johnsons then requested the Residence Inn to follow up on their expressed agreement to take Cotton to a local veterinarian for examination and processing for travel as they had agreed.

36.     Plaintiffs were under the impression that under Marriott's and the Residence Inn's stated pet policy they need not worry, that Cotton would be safe in the hotel, and were so advised by the defendants.

37.     Plaintiffs were charged $ 250 by Residence Inn by Marriott to keep Cotton in the hotel room as per their agreement.

38.     As a condition precedent to paying their fees the Johnsons agreed that Cotton be kept safe in the room until taken to a local veterinarian.

39.     On July 20, 2014, defendant Black notified the Johnsons via e-mail "Cotton is doing well. I will be leaving the hotel shortly and I will make sure she is fed. She is such a sweet heart. I just wanted to let you know that the guest in room 132 that you had lost the cat in found her. This caused quiet (*sic*) a commotion at midnight. I have to charge you for the guests (*sic*) stay last night. So you will be charged the comp'd room. If you need to reach me, my cell is 631-816-1863. Talk to you soon. Warm regards, Kerri Leigh Black."

40.     On July 21, 2014, defendant Black notified the Johnsons via e-mail: "No worries. I have her at my house. I dont (*sic*) know where she is though. She has been hiding somewhere. Ive (*sic*) looked everywhere. I put food out and brought her the temptations. She ate them last night

in the middle of the night. I'm working until 8 tonight. Ill (*sic*) email you when I get home to update you."

41.     Upon information and belief, defendants, including Fierros authorized Black to remove Cotton from the Residence Inn.

42.     The Johnsons timely objected to Cotton's removal from the Residence Inn and their failure to comply with the instruction given to them upon the discovery of Cotton. Thus, the contract with Residence Inn was breached when Cotton was removed to an undisclosed location without knowledge or consent from the Johnsons.

43.     Upon information and belief, defendant Black took Cotton to defendant Urbanski's residence, without defendant Urbanski's permission. Defendant Urbanski informed Plaintiffs via recorded conversations on 8-21-14 and 8-22-14 that he told Defendant Black not to bring Cotton to his home. Exhibit F.

44.     Upon information and belief from approximately July 21, 2014, until July 29, 2014, Cotton was trapped inside a wall at Urbanski's residence without food or water.

45.     At no time did Black inform plaintiffs that Cotton was at Urbanski's residence without food and water, rather than at "her residence." Thus Black deceived Plaintiffs about Cotton's whereabouts.

46.     Upon information and belief Black informed all Defendants about Cotton's whereabouts, whereupon Defendants cut off all communication with Plaintiffs, including any attempts for the Johnson's to question defendant Black.

47.     On a date subsequent to July 29, 2014, the Johnsons asked Black about any efforts to locate Cotton and were informed: "Nothing, but she was thinking about having a BBQ and inviting some friends over" and they could "look for Cotton."

48.     Several days passed with more telephone calls and e-mails to Marriott. No one at any of the defendants' offices or places of business would respond via telephone or e-mail.

49.     On August 1, 2014, Johnson e-mailed letters to Defendants Sorenson, Bill Marriott and Ryan inquiring about how Cotton had been lost, what had been done to search for Cotton, and what actions were to be taken immediately. Johnson received a response from Defendant Dempster informing the Johnsons about how much they were doing to search for Cotton. (Exhibit B).

50.     On August 2, 2014 the Johnsons received an e-mail from Defendant DeCicco informing the Johnsons of their extensive efforts to search for Cotton. (Exhibit C)
(In his statement De Cicco states that Cotton had no collar or identity; however, all Defendants had been informed that Cotton was microchipped.) *Supra* at ¶ 29.

51.     Upon information and belief, defendants DeCicco, Dempster and Black knew the whereabouts of Cotton, but chose not to have Cotton returned to the Residence Inn or to take Cotton to a local veterinarian, as required by contract.

52.     On or about August 6, 2014, all Defendants would provide only the vague location of Pamlico Avenue and Wildwood Road, Ronkonkoma, New York,  as a location where Cotton might have last been seen.

53.     Jeffrey Johnson flew back to the U.S. from Israel from August 13 to August 16 to search for Cotton.  Despite local flooding, he spoke with neighbors in the area of Pamlico Avenue and Wildwood Road, the only coordinates given by Defendants. None of the people Johnson was able to speak with recalled seeing Cotton, or seeing anyone searching for Cotton, or noted any posted notices about Cotton.  Thus Defendants' claims to have used any diligence in searching for Cotton are false.

54.     Johnson then engaged the assistance of professional and volunteer animal search and rescue groups and other volunteers in the animal care community. Due to the lack of definitive information, the search by professional animal rescuers, with a scent tracking search dog, could not take place until August 24, 2014. All animal shelters and veterinarians were advised through Plaintiffs' agents by posters and e-mails of such posters to be on the alert for any appearance of Cotton. (The information was revealed in the taped interviews with Urbanski, *supra* at ¶ 45.)

55.     All inquiries to all Defendants were either not responded to, or rudely responded to. On August 15, 2014 defendant Fierros handed over Cotton's carrier to Johnson for the rescue groups who preserved it for the search for Cotton.

56.     From August 15, 2014 until September 3, 2014 Suffolk County Police and Suffolk County SPCA conducted a civil investigation into the defendants' actions. (Suffolk County Police Central File No. 14-509414; SPCA Operations, Mr. Laton).

57.     At no time relevant to this complaint have defendants made any effort to assist Plaintiffs and their agents to find their companion animal Cotton, and refused to place a notice on any social media. As a result of this negligence, plaintiffs have suffered pain and suffering because of the loss of their beloved companion animal, Cotton, and have accumulated medical bills as a result of Mrs. Johnson's treatment.


### AS AND FOR A FIRST CAUSE OF ACTION
*Negligence and Recklessness*


58.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 57 as if set forth fully herein again at length.

59.     Defendants have violated the laws of New York State Agricultural & Markets Law and Federal law, The Animal Welfare Act, in not reporting the loss of an animal to any agency since it occurred.

60.     Upon information and belief, Defendants failed to train their associates, managers and contract staff on all pet handling procedures in accord with their written policy.

61.     Defendants, its agents, servants and/or employees, were negligent in the ownership, management, and care and maintenance of Mr. Johnson's room (#132) at the Residence Inn by Marriott in Central Islip, New York;  Defendants, its agents, servants and/or employees failed to employ reasonable and customary standards for pet friendly rooms as promoted by Defendants.

62.     Defendants, at all times relevant hereto, were in exclusive possession and control of Room 132 at the Residence Inn by Marriott and  Johnson's companion animal Cotton, and by their failure to exercise reasonable care to protect Cotton from any injuries or harm, Cotton's whereabouts became unknown. By this failure to exercise reasonable care, Defendants caused Plaintiffs and family unnecessary physical and emotional injuries. Defendants are solely responsible for the injuries suffered.

63.     The Johnson family was a lawful guest of the Residence Inn by Marriott and defendants, its agents, servants and/or employees had a duty to ensure they were given safe and suitable accommodation, and that such accommodation was suitable for the purposes for which it was intended.

64.     Plaintiffs have endured humiliation and psychological anguish as a direct result of the Marriott Residence Inn's failure to adhere to its pet policy that created a heightened expectation on which the  Johnsons relied: that as a paying guest they would have a safe and pet friendly room.

11

65.     Defendants negligently and recklessly breached such duty through the conduct described herein.

66.     The foregoing incidents and the resulting damages were directly and proximately caused by the negligence and recklessness of defendants, its agents, servants and/or employees in the ownership, operation, control and maintenance of the Residence Inn by Marriott without any negligence on the part of the Johnsons contributing thereto.

67.     As a result of this negligent hiring, training, supervision, overseeing and retention of defendants, its agents, servants and/or employees, the Johnsons have suffered and continue to suffer sleepless nights, mental anguish, physical pain, and emotional distress to the extent that Mrs. Johnson needed treatments, as well as other damages.

By reason of the foregoing, Plaintiffs demand judgment against Defendants in an amount to be determined by the Court at trial.


## AS AND FOR A SECOND CAUSE OF ACTION
### *Intentional Infliction of Emotional Distress*

68.     The Johnsons repeat and reallege each and every allegation contained in paragraphs 1 through 67 as though set forth fully and at length herein.

69.     Defendants' conduct as described herein and yet to be discovered, intentionally and deliberately inflicted emotional distress upon Plaintiffs, was and continues to be outrageous, extreme, and shocking to the community.

70.     The Defendants' refusal to cooperate with Plaintiffs was intended to cause, and did recklessly cause Mr. Johnson and his family mental and emotional distress.

71.     By reason of the foregoing, Jeffrey, Shoshanah and their son, Isaac Johnson, have suffered compensatory damages in an amount that exceeds the jurisdiction of all lower courts.

72.     By reason of the foregoing, the Johnsons request punitive damages in an amount that exceeds the jurisdiction of all lower courts.

### THIRD CAUSE OF ACTION
*Failure to Act*

73.     The Johnsons repeat and reallege each and every allegation contained in paragraphs 1 through 72 as though set forth fully and at length herein.

74.     Defendants', its agents, servants and/or employees, failure to act in the ownership, management, and care and/or maintenance of the Johnson's companion animal Cotton was in direct violation of New York State Agricultural & Markets Law, Article 26, § 353: in which all persons must give appropriate water and food or be in violation of the law.

75.     Defendants' its agents', servants' and/or employees'', failure to act and comply with community standards and the federal law, The Animal Welfare Act, 2143, et seq. is equally a violation of the law.

76.     By reason of the foregoing, Jeffrey and Shoshanah Johnson have suffered compensatory damages in an amount to be determined at trial.

78.     By reason of the foregoing, Plaintiffs demand judgment against the Defendants which exceeds the jurisdiction of all lower courts.

### FOURTH CAUSE OF ACTION
*Breach of Contract and  Implied Warranty*

79.     The Johnsons repeat and reallege each and every allegation contained in paragraphs 1 through 78 as set forth and at length herein.

80.     Defendants breached their contract and implied warranty and the guarantee that Cotton would be safe and returned to the family when they were charged for her safekeeping in the room the Plaintiffs had occupied. Defendants implied in their statements that they were undertaking the duty to care for the Johnsons' deeply loved Cotton while international preparations were made for her safe transport. *See* Exhibit A

81.     By reason of the foregoing, the Johnsons have suffered compensatory damages in an amount to be determined at trial.

82.     By reason of the foregoing, the Johnsons request punitive damages in an amount that exceeds the jurisdiction of all lower courts.


FIFTH CAUSE OF ACTION
*Fraud and Negligent Misrepresentation*

83.     The Johnsons repeat and reallege each and every allegation contained in paragraphs 1 through 82 as set forth and at length herein.

84.     Defendants, its agents, servants and/or employees, undertook to house companion animals as part of its business as a lodging concern for pets and their families for valuable consideration.

85.      Upon information and belief, this part of Defendants' business included representing, advertising and encouraging family members to travel and to reserve rooms in their hotels and that these hotels were safe for companion animals, including domestic cats.

86.     The Johnsons relied upon their advertising and representations in choosing Residence Inn by Marriott for their pre-flight hotel stay with their companion animals.

87.     Defendants Marriott, Briad, and Residence Inn, et al., intended to deceive Plaintiffs by concealing the truth about Cotton's location and should have known that Plaintiffs would rely upon such misrepresentations, especially considering that Plaintiffs expressed their serious concern over the safety of their companion animal, Cotton.

88.     When Defendants made these representations, they knew them to be false and made them with the intention to defraud Plaintiffs and to induce Plaintiffs to act in reliance on these representations in the manner herein alleged.

89.     Had Plaintiffs been aware of the actual situation, Plaintiffs would have taken emergency measures claimed to have been taken by Defendants.

90.     Plaintiffs' reliance on Defendants' representations was justified because Marriott is a reputable hotel whose representations most travelers would rely upon.

91.     The aforementioned conduct of Marriott Residence Inn was an intentional concealment and misrepresentation of a material fact known to Defendants with the intention of concealing information and depriving Plaintiffs of property and causing emotional injury that subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights.

92.     By reason of the foregoing, the Johnsons have suffered compensatory damages in an amount to be determined at trial.

93.     By reason of the foregoing, the Johnsons demand punitive damages in an amount that exceeds the jurisdiction of all lower courts.

### SIXTH CAUSE OF ACTION
*False Advertising*

94.     The Johnsons repeat and reallege each and every allegation contained in paragraphs 1 through 93 as set forth and at length herein.

95.     At all times herein mentioned, Defendants Marriott and Briad and their employees engaged in advertising their superior hotel services to the public.

96.     On or about April 4, 2014, Defendant Marriott represented to the public, including Plaintiffs, through advertisements via pamphlets, mail, face-to-face solicitations, a web site and other means, that animals are safe to stay at its hotels.

97.     Plaintiffs relied upon their representations to stay at their hotel (s). At the time Defendants made such representations Defendants had no reasonable grounds for not believing its representations to be true.

98.     Defendants' representations were false in that it did not treat Plaintiffs' companion animal Cotton as member of the family, did not provide an animal safe room ensuring Cotton's safety, comfort and security.

99.     As a proximate and legal result of Defendants' intentional misrepresentations, Plaintiffs were induced into renting a hotel suite from Defendants.

100.    By reason of the foregoing, the Johnson family has suffered compensatory damages in an amount to be determined at trial.

101.    By reason of the foregoing, the Johnsons request punitive damages in an amount that exceeds the jurisdiction of all lower courts.

    WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, as
            follows:

        a.      For compensatory damages including the value of Plaintiff's loss of companionship of their beloved companion animal, Cotton, in an amount of to be determined at trial;

b.      For mental, physical and nervous pain and suffering and serious emotional

distress;

c.      For punitive damages;

d.      Awarding Plaintiffs reasonable attorney's fees and costs of searching for Cotton;

e.      Granting such other and further relief as the Court deems just and proper.


Dated: New York, New York
        November 3, 2014


                                LUCILLE A. ROUSSIN
                                Attorney for Plaintiffs

                                By _____
                                Law Office of Lucille A. Roussin
                                243 West 99 Street
                                New York, N.Y. 10025
                                (212) 888-0468

Exhibit A

Pets are considered a part of the family, and devoted pet owners who travel with their cats and dogs have a discerning eye when it comes to finding the best pet-friendly hotels. **At Marriott, pets are treated to the same outstanding service as human guests.** (Emphasis added) No matter your reason for traveling, you can rest assured that your furry friends will enjoy a relaxing, comfortable stay in our pet-friendly accommodations.

Each pet-friendly hotel offers a range of amenities designed to accommodate pet owners. Let your cat curl up with you in a luxurious bed or enjoy a treat while you work at the in-room workspace. Planning an outing with your pet? Use our complimentary Internet access to find the nearest dog-friendly spots and local pet stores. For guests who want to stay fit, on-site health and recreational facilities offer plenty of opportunities for exercise when you can't hit the trails with your pet.

Choose Marriott, and our exceptional pet-friendly lodging will provide both you and your "best friend" with an ideal getaway. Signature service, top-notch amenities and dedication to customer satisfaction set our pet-friendly properties apart from the rest.

For additional information on pet-friendly amenities at Marriott, please contact our hotels directly. Pet Fee, Weight and Breed restrictions may apply."  Another advertisement: Pet Friendly Perks-Guest amenities continue to "man's best friend" at the JW Marriott. One of the best pet friendly hotels, your canine will be in "doggy heaven". At no additional charge, your pet will love its sheepskin bed, stainless- steel bowls, and specialty biscuits, not to mention the love and attention from our associates. Make sure to ask our concierge about the many walking and hiking routes nearby that you and your pooch will love!  http://www.marriott.com/hotel-search/pet-friendly.hotels

1

Exhibit B:

 "Dear Mr. Johnson, Ed Ryan, to whom I report, has forwarded your correspondence of last night and this afternoon to me for follow up.  I am looking into this matter now.  I've asked the head of our Internal Investigations group to contact the property managers to obtain as much information as we can immediately get on the status of your family's cat, Cotton.  I have no information about this unfortunate situation at present except what I have read in your emails. While it may be of little moment or concern to you at this time, and perhaps it will seem somewhat technical, the Residence Inn hotel where you stayed at the time you lost your cat, is a franchise hotel and is not managed by Marriott International.  It is owned and managed by another company.  Of course, I will not let that prevent me from attempting to get additional clarity around this situation.  Therefore, I will also be in touch with someone in authority at the franchisee's offices to alert them of your concerns, in case the franchise company is not already aware of the events that transpired at this hotel. For what it's worth to you in the circumstances, I'd like you to know that I have owned both dogs and cats in my household and currently own a wonderful dog, a 12 year old Bouvier de Flandres. I can empathize with your concerns.  It must have pained you to have lost your cat, Cotton, in the first instance and to have left your cat behind.  I'm hopeful and reasonably confident the staff of the hotel would have acted responsibly in this unusual situation but I cannot speak to that issue yet. I will get back to you as soon as I learn more.

Very truly,

 bill dempster Wm. J. Dempster Senior Vice President & Global Compliance Counsel.

2

Exhibit C:

"Mr. Johnson, I operate the Residence Inn by Marriott hotel in Islip NY and have been speaking to the hotel managers regarding this issue since it happened.  I will be your contact for all communication from the property regarding the search for Cotton and will keep all appraised of our efforts to find your pet.  I will update you daily on our progress and success. Today the hotel staff is putting up "lost cat" flyers in the area of the Kerri Black's (Operations Managers) home where the cat was last seen.  It's been put on street posts, in supermarkets, gas stations and convenience stores. Our managers have also begun going to area animal shelters to see if the cat was found by anyone, I've attached a list of those shelters. They will have the flyers with her picture and my **daily until Cotton is found.  We also had a rescue cage set up near her home with Cotton's food and water in it.**  (Emphasis added) We are hoping this will be contact information.  **We will continue to visit and communicate with these shelters (emphasis added)** successful if she is still in the immediate area.  Note: Cotton had no collar or identification when it was found in the hotel room and still does not.

Please understand, that while it was not appropriate for the Operations Manager to take your cat home after your departure I understand it was done so by your request.  Kerri went out of her way to buy the food and treats she was told Cotton liked and until her escape provided a safe environment.  It seems that canceled flights and turmoil in your region as well as a very shy cat worked against us and our manager Kerri Black did all she could in a bad situation.  When Cotton was finally found in her home they tried to get her in its cage during which Cotton attacked and wounded a family member before it ran to a window and pushed against the screen to escape their home.  We understand that this is a very shy cat, it did not want to be found by you in your hotel room, or by Kerri black in her apartment.  Kerri Black cared for Cotton for

3

well over a week and was crying and heartbroken when the Cotton escaped her home.  I know

from seeing your e-mails that you are all aware of her efforts and are understandably upset and

frustrated by the situation, we have been doing and will continue to do all we can.  We are very

sorry this is happening to your family and to Cotton. David DeCicco Vice President – Hotels

Briad Group (973) 597-6433 x 1162."

Exhibit D

"To j johnson   CCWilliam Dempster, Ken.capone@marriott.com. I have no new news to give

you regarding the search for Cotton.  As you must realize by not being able to find her when you

left our hotel, Cotton is able to hide well when not wanting to be found.   At least one person on

our staff has walked the area Cotton was last seen calling her name each day since she ran away.

She has not responded to our calls as she did not respond to your calls.   We have posted and

maintained flyers in the area since last week to no avail.   It is my understanding that as of just

yesterday, your contact at Countryside Veterinary hospital put out an alert to area Veterinarians

and the shelters I provided you with,  providing them with pictures and the microchip number.

Anyone finding Cotton from this point on will now be able to get in contact with you and

Countryside directly.  I have always had a pet as part of our family and can only imagine how

difficult it must be for you to have left Cotton and not know where she is still.   It has been a very

trying and emotional experience for our associates who tried so hard to find and care for Cotton

in your absence.   I know from your e-mails to them and me that you are grateful for their

thoughtful efforts and time spent outside of their regular job responsibilities to care for and find

Cotton.  At this point, we have exhausted all our resources in trying to find Cotton.  I strongly

hope and believe that the many resources you have engaged to find Cotton are successful and I

ill continue to alert you if we hear anything new.  I will have the cage brought to any local

facility near Ronkonkoma or available for pickup at the hotel.

Thank you David DeCicco;  ddecicco@briad.com."

Exhibit E

Defendant Bill Marriott recently (July 15) experienced the passing of his lifetime companion Murphy: "Our beloved golden retriever, Murphy, recently passed away. He had been a wonderful member of our family for 13 years. Murphy was our third golden retriever.  He brightened our lives with sweetness and goodness.  The only thing he ever asked from us was to be petted.  He could never get enough.  If I was sitting in my chair reading or watching TV, he would come to me, put his nose under my arm and push upward, signaling that it was time to be pet! I blogged about Murphy a few years ago, when he was spending the summer at our New Hampshire lake house.  When he was young he would jump in the lake and chase the ducks.  As he grew older, he finally realized that he would never catch them.  So, he just laid out on the dock and watched them swim by. It seemed that everyone he met became a fan and really loved him.  Six months ago he underwent surgery at a large veterinary hospital in Maryland.  As he was recovering, the lead vet had Murphy join him as he made the rounds to see the other sick animals.  The local veterinary doctor who treated him in his final days wrote, "Murphy was such a sweet dog.  He was always a joy to see here at our clinic.  I know he will be missed." I'm sure if Murphy had been a person, his personality and love of people would have made him a great hotel executive.  Our family truly loved Murphy; he never wanted anything, but our love.  We really miss him.  **I'm Bill Marriott and thanks for helping me keep Marriott on the Move"** **http://www.blogs.marriott.com/marriott-on-the-move/2014/07/farewell-to-murphy.html#sthash.3hoVZABw.dpuf** (Emphasis added)

Exhibit F:

Transcription details:

    Date:                       August 21, 2014

    Input sound file:          don Recording

Transcription results:

| | |
|---|---|
| JJ 00:01 | Calling Don. |
| DU 00:15 | Hello? |
| JJ 00:17 | Yes, is Don in please. |
| DU 00:20 | Who's in? |
| JJ 00:21 | Is Don in? |
| DU 00:24 | Yes, this is Don. |
| JJ 00:26 | Don, this is Jeff Johnson. |
| DU 00:29 | Hi. How are you doing, Jeff? |
| JJ 00:31 | I could be better. I mean, I'm struggling in my life-- |
| DU 00:35 | I understand [inaudible]. |
| JJ 00:43 | I'm just trying to figure out-- I'm getting so many stories on so much stuff, and you're the first person who's told me-- |
| DU 00:51 | Well, from what I'm hearing is you guys got a little stressed out, Marriott got a little afraid of a lawsuit and then they stopped playing ball with you guys. I'm a third party. I know the whole story. I've heard your side and I've definitely heard their side, just from being in a relationship with Kerri. |
| JJ 01:11 | Right, well, I don't-- |
| DU 01:13 | Like I said, I'm more than willing to cooperate but I mean, I don't want $2000. I just want $648 or $633 that I'm inconvenienced, and I don't want-- if you don't trust me, you don't want to do it that's fine. |
| JJ 01:29 | No, no, no. |
| DU 01:30 | I don't want you to waste my time. I don't want to waste yours. And I wouldn't mind screwing Marriot and Kerri anyway. |
| JJ 01:36 | I guess what I-- listen. I'm a man of moderate means. I'm 55 years old, |

7

|  | I've worked all my life in factories. Now I'm talking to someone in which I just flew 10,000 miles to try to find a cat, and then when I go to Marriott, they tell me, "Oh, just go to Pamlico, Wildwood," which isn't even close-- I mean it's close, but I mean the guy's telling me it's a stone throw-- |
|---|---|
| DU 02:05 | It's like five houses from my house, I'll give you that.  I mean that's pretty much where the cat was last seen. |
| JJ 02:11 | Okay, so the only thing-- listen, I'm going to make sure, because you're the only person who's been honest with me, I'm not doing anything with Paypal. You're going to just get a check in the mail and you go cash it.  That's the way I do business, and people who've known me for 30 years-- I'm not asking you to cooperate-- |
| DU 02:30 | I have no problem with that. |
| JJ 02:33 | All right, just-- |
| DU 02:34 | As long as you don't mind-- I'm a man of my word. |
| JJ 02:37 | I'm not, listen-- |
| DU 02:38] | [inaudible] |
| JJ 02:39 | I'm not here to ask you anything other than-- listen, I can get-- I'm not worried about it. If I have people - because I'm 5,000 miles from you - if I have people go start sniffing in the middle of the block, because Cotton does not go far. She's a scared little cat, she's not going to go far. She's still-- |
| DU 03:02 | I know I've met her. |
| JJ 03:03 | So she's still going to be within two or three houses of your house, because she doesn't know anything else. She's confused and-- |
| DU 03:12 | I know. I've met the cat, she's very sweet. |
| JJ 03:14 | Right, but the cat's been gone three weeks. My wife is going up the wall, I've got to find this cat. Simple as that. Anyone who wouldn't-- that's the problem with these people that Kerri works for. Just tell me where the cat is, all this BS was ridiculous. It's a stupid little cat, it's nothing else, I don't-- |
| DU 03:40 | Jeff, Jeff, Jeff, I understand what you're saying. Like I said, I don't want to waste your time, I don't want you to waste mine. I'd love to help you, but honestly I don't want $2000. I just want to be compensated what I'm dishing out. I'm not asking for pain and suffering. The cat bit me three times. I was crying because I felt bad the cat got away. I hear you, I love cats. My cat [?] eight and a half years old. That's my baby, I sleep with her every night. I give her medicine, because she's sick for the past seven years. I understand. |
| JJ 04:08 | What doesn't-- listen-- |

| | |
|---|---|
| DU 04:10 | I am of moderate means myself, and I could not afford the $400 doctor bill. I had to go get [tested?], and to make sure there was nothing wrong with me in the office. I didn't want to. Everyone's saying, "He's a wild cat, you don't know where it's from. You've got to get tested, you got to get this." You know what I mean? I couldn't afford that, I don't have health insurance. I make just enough not to get Obamacare, and not a good enough job to get health insurance. |
| JJ 04:35 | Listen, that cat's the healthiest cat in New York. |
| DU 04:41 | I understand. I understand what you're saying. But when the cat bit me three times while I'm trying to get it from running away, I had to go to the hospital. When I had to rip apart my walls to get it out of the wall, through the sheetrock-- |
| JJ 04:53 | Right, right. |
| DU 04:55 | -- spackle. Paint to redo up my closet. |
| JJ 04:58 | I got-- all right Don. I got you. |
| DU 05:01 | I told Kerri not to bring a cat home and she did it anyway. |
| JJ 05:05 | Hey. Just-- |
| DU 05:04 | There's a lot more [to that?] |
| JJ 05:08 | Listen. Screw Marriot. I'm in Israel. There's no Marriots here. Why would Marriot even send the cat with Kerri to the house? That's crazy. You should have said no. That's crazy. |
| DU 05:23 | I did say no. She did it anyway. |
| JJ 05:25 | Why would she do that? |
| DU 05:26 | It's my girlfriend. I would love to answer all these questions for you, but unfortunately I got to try to recoup some of my losses and I would love to help you just for good reason but Marriot is not compensating me at all and until you do something I'm not helping anyone. |
| JJ 05:43 | What do you mean Marriot's not compensating-- |
| DU 05:44 | I can't afford my rent [inaudible]. |
| JJ 05:48 | All right listen. |
| DU 05:48 | With my landlord wondering why there's a cat in the wall for ten days because all these fucking-- |
| JJ 05:55 | Don. Listen. |
| DU 05:58 | There's not supposed to be any more pets than one cat here. |
| JJ 06:00 | Listen, listen. You're alive. I've-- listen. You're not dying, all right? The person-- listen, I just flew 10,000 miles, I was two doors from your house. I mean why wouldn't people-- what I'm asking is everyone I |

9

|          | talked to went out of their way to help me. Now I'm talking to you from 5,000 miles and all I'm getting is how much Cotton hurt you, but then you said Marriott won't pay you. If Marriott-- listen, I'll give you your $650, I understand that you're out all this  money but that still doesn't answer one question, all right? What-- |
|----------|---|
| DU 06:45 | But that still doesn't give you the cat back too, even if I told you my address, and told you were the cat lives, [inaudible] you basically [inaudible] that's still not going to give you the cat back. Why would you even-- you know what I mean? |
| JJ 06:55 | Don. |
| DU 06:55 | If I were you I wouldn't give me the money. |
| JJ 06:57 | Don, Don. Listen, it's easy for-- listen, I already know the address I'm not worried about that. I'm not calling you to get the address. I've already been told the address. They were compelled to give to the SCPA today. I knew the address at 10:00 this morning, 637 Wildwood. That's not the point, the point is I want to know why Marriot mistreated you? I don't care about the rest. They're coming to find Cotton. All right, they'll be there tomorrow-- |
| DU 07:32 | They're covering their ass [inaudible] what they're doing, what they're lying about. I know all that. |
| JJ 07:41 | What do you mean lying? Why would they lie about a cat? |
| DU 07:44 | Kerri comes home and talks-- Kerri came home every day this week and just started bitching on and on about it. [inaudible] I saw the letter that you guys sent to her [?] in the mail [inaudible] you know what I mean, and I've seen the letter. I understand. |
| JJ 08:09 | Well okay, but did they-- |
| DU 08:10 | I'm no [inaudible]. |
| JJ 08:12 | Yeah, I understand this, Don, but something does-- you know, let me put it this way, why would Marriott-- I don't know what day Cotton got out of the house from you, but why would Marriott-- |
| DU 08:27 | I will answer [inaudible] you need to stop asking me questions. You want to give the money that I'm out I will answer every question you have, I will testify in court, I will fucking sign notarized documents, I will fulfill them. But until you do that, you want to mail me a check, [inaudible] answer slow as you like. |
| JJ 08:45 | All right. |
| DU 08:45 | You want to come here and give me money in cash and talk to me, just answer slow as you like. |
| JJ 08:49 | But do you understand-- |

10

DU 08:50          You know my address? Make an appointment to come see me.

JJ 08:53          But, do--

DU 08:54          You know my address, they're going to check [inaudible] call me. I don't know what else to tell you.

JJ 08:57          No, what I'm asking you is why would someone not help someone whose cat may be out there suffering? That's the part I got-- I understand your bills, I will pay your bill. But why would you wait to try--

DU 09:15          I already paid my bill and now I can't pay my rent. I've already paid my bills. I paid my bills I have an over 700 credit score. I've been on my own since I was 17, I'm 32 here.

JJ 09:26          Okay I've--

DU 09:26          I've paid my bills.

JJ 09:28          Don, Don. Listen to me for a one second. I'm older than you are. I'm trying to work this thing out. What I'm asking you is--

DU 09:37          Okay, this is how you are working it out. You're going to pay my bills, send me the money and I'll talk to you. Sorry to be rough but I mean it's the real world. I can't pay my fucking rent right now, do you want to help me? I'll help you. You losing your cat, Kerri bringing it to my house, all you [inaudible] stress on me. Somebody help me out and I'll help you guys out. I'm not trying to shake anyone down, I'll hold on to what I'm deserved. Understand?

JJ 10:04          All right listen I'm going to call someone, I'm going to see if they can deliver you the money and I'll wire it to them.

DU 10:13          Excellent. I'll be home most of the evening, call me and let me know. And I will promise you I'll do everything within my power to help.

JJ 10:22          It's 3:00 in the morning--

DU 10:23          Everything.

JJ 10:24          It's 3:00 in the morning here okay, so it's not going to happen until the--

DU 10:28          Okay, so within the next 24 hours be in contact with me. You have my phone number. Jeff, if was nice speaking with you, have a nice evening.

JJ 10:35          You too, bye.

                  [silence]

11

Transcription details:

| | |
|---|---|
| Date: | August 22, 2014 |
| Input sound file: | don Call 8-22-14   Don Urbanski 12 minutes-- 367 wildwood Ronkonkoma, NY 11779 (Kerri Leigh Black former boyfriend) |

Transcription results:

| | |
|---|---|
| JJ 00:01 | Call to Don. |
| | [silence] |
| DU 00:17 | Yes, hello [?]? |
| JJ 00:18 | Hey, Don, can you hear me? |
| DU 00:21 | I can hear you. |
| JJ 00:22 | All right. Sorry about that. I just-- every time I call you, it disconnects. |
| DU 00:28 | No worries. I'm on a mini-vacation myself right now. |
| JJ 00:33 | At least someone is. I haven't worked since March. Hey, listen, two things real quick. I've got to get some sleep because it's almost 1:00 over here. Then I'll get-- |
| DU 00:45 | Whatever you need, I'm here for you. What do you need? |
| JJ 00:47 | All right, first of all, one of the ladies who's going to try to help find Cotton, she's in Connecticut. She wants to  know what direction the cat ran from your home, if you recall. |
| DU 00:59 | Okay and yes. As you know, you know my address 367 Wildwood. |
| JJ 01:04 | Okay. |
| DU 01:05 | The cat ran the direction west-- sorry east. It ran east at least two or three properties, there's a stump there - like an abandoned lot. I'm pretty sure the cat ran into the abandoned lot. It's got a fence around it that says no trespassing. |
| JJ 01:20 | Is it yeah - is that towards Pamlico? |
| DU 01:24 | It's towards Pamlico, correct - not towards [?]. |
| JJ 01:28 | Okay, good because that's as far as I went down that street when I was over there in the US. I went to that lot and I said, "Boy, that's a--" |
| DU 01:37 | I even went down there myself. Just for a couple of minutes. Just to see if we could find it, but it was still probably really shaken up. What happened was-- I don't believe anyone told Kerri to bring the cat home. I think she didn't want to leave over there. Kerri is a very loving person. She never meant anything bad to happen even though she's an idiot |

[chuckles]. I said, "Don't bring the cat home." She brings that cat home. I also have a cat. Cotton ran into the wall by the oil tank in my house and was there for a good seven, eight days. The same day she bring it home, that happened. Then also at 3:00 in the morning, we hear the cat. It came out - we got it. I said, "Call the animal shelter - someone that can just check it out, make sure the cat's okay, and board it. And we can get a hold of these people," because I told her she was stupid for assuming [inaudible] liability for the cat in the first place. Why would you ever take it out of the hotel? Do you know what I mean?

JJ 02:41          Right.

DU 02:43          So she takes the cat-- I take the cat and put it in my bathroom, just so it couldn't escape anywhere. She goes in the bathroom ten minutes later and opens the window thinking, "Oh, so the cat could breathe better." I go in the bathroom ten minutes after that - I see the cat trying to back its butt into the screen, and pushes the screen out right as I'm walking in. So I go to grab Cotton, and then she jumps down. I kind of get her by the tail but the screen was kind of still half connected. She jumped up and down on this crate that was outside my window two or three times. When I went to go pull her back in, she turned around and bit me real hard and I let go. The dogs that are in my backyard - I have two small dogs - they start chasing her around. She gets into the front yard and runs left down Wildwood. Kerry's crying, hysterical, and chasing after her. I'm not far behind, and Cotton's gone. She turns around and she sees my arm dripping blood everywhere. Because cats, their teeth puncture. They don't tear like a dog, you know?

JJ 03:42          Right, I know.

DU 03:44          Yeah, and then that's the last we saw of the cat. Since then, Marriott-- they have been trying somewhat. They put up signs and then they put a humane trap in my backyard. I told them to put it by the stump, but the idiot manager-- whatever her name is. Sue, I think, or something. She comes to my house, sees a worker there because we have workers in the house, and the worker's like, "Yeah, you can put the trap in the backyard." I go in the backyard a couple of hours later, and one of my landlord's small dogs is stuck in the trap [chuckles]. And I flip out. I call up my girl. I told [?] - I'm like, "What the hell? I told you to put it down by the stump, your idiot thing." If our landlord saw his dog stuck in the trap he'd be suing Marriott too," like, "What in the hell is wrong with you?" I start screaming at this lady. Kerri never even says anything, so we returned the humane trap, and from then it was just all the politics of you guys going back and forth.

JJ 04:38          Yeah, no I know-- do you think that if cat food were put outside of your home, because Cotton's the type not to run too far even though she doesn't like the house-- what do you-- do think that she--?

DU 04:53          Because the dogs are almost always in the backyard, I don't really see

|          | her going back there. |
|----------|------------------------|
| JJ 04:58 | Yeah, she won't go-- |
| DU 04:59 | But the stump is one or two properties away from me. She's probably hanging around there and walking by people's houses at night looking for food or something, you know? |
| JJ 05:07 | Right. Well, because I-- someone told me there's-- some people feed their cats outside, so there's a lot of cats in the neighborhood who can access other cats' food. |
| DU 05:21 | Right. That might be true. I don't know too much about that. I didn't-- spoke to anybody. |
| JJ 05:26 | So, what's the rest of the story regarding Marriott? Did the only person that came over to your-- because they-- I talked to neighbors. No one has heard much about this. Yeah, there was a sign put up. |
| DU 05:39 | The general manager did put a humane trap in my backyard, which we did not authorize, first of all. I told her to put it in the stump. It was there for about two hours until our dog got stuck in it and I got real pissed and said, "Get this thing the hell out of here." |
| JJ 05:53 | Right. |
| DU 05:54 | Because I didn't-- you know what I mean? From my position, you understand? |
| JJ 05:57 | Right. No, I do, I-- |
| DU 05:58 | The freaking lady-- I don't know you or the freaking lady put this in my backyard, my landlord's dog's trapped for at least 45 minutes to 2 hours. In a trap that he can barely sit in, you know? |
| JJ 06:08 | Has anyone from that darn company spoken with you at all? Because, I got to tell you something, we don't know each other. Listen, I could care less-- listen, dogs, cats, animals, they can run away or whatever, but the thing is-- and listen, I've been a VP of some pretty big organization. If something like this happens, I'm going to get something resolved because I know it's going to come back to bite me in the ass. Something doesn't-- |
| DU 06:39 | This is what-- I don't believe anyone told or authorized Kerri to bring the cat home. |
| JJ 06:45 | Right. I figured that. |
| DU 06:46 | I told her not to. |
| JJ 06:48 | They were-- |
| DU 06:51 | She took it upon her own to do that, because she felt bad for Cotton. She didn't want to-- and she knows it hasn't eaten in a couple of days because it was stuck in the hotel room-- the kid didn't find it in the |

14

|         |                                                                                                                                                                                                                                                     |
|---------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|         | hotel room for two or three days later, it was hiding.                                                                                                                                                                                               |
| JJ 07:03 | But the-- what I-- they charge--                                                                                                                                                                                                                    |
| DU 07:06 | She ate a very little bit before she ran away from our house.                                                                                                                                                                                        |
| JJ 07:10 | They charge--                                                                                                                                                                                                                                        |
| DU 07:11 | We gave her wet food and she ate a very little bit of it.                                                                                                                                                                                            |
| JJ 07:13 | Don, they charged me for Cotton staying in the hotel room.                                                                                                                                                                                           |
| DU 07:19 | Yeah, I know.                                                                                                                                                                                                                                        |
| JJ 07:20 | I got an email and we assumed that Cotton was staying in the hotel room, because we were making arrangements for someone to pick Cotton up so they could transport her by air. So it didn't make any sense. I mean, did Sue? Who told-- I don't understand who made the final-- |
| DU 07:40 | Sue is the General Manager of the property. Kerri is the Operations Manager - one below her. She's the manager of the managers.                                                                                                                       |
| JJ 07:50 | Okay, but do you think-- I mean, do you have any idea what they conversed on, how they arranged this or no because--?                                                                                                                                 |
| DU 08:00 | All I know is the first time I told Kerri, "Don't bring the cat home. We should bring it to a boarding shelter or something and let them know where it is, and they can work it out with them.                                                         |
| JJ 08:10 | Right, exactly.                                                                                                                                                                                                                                      |
| DU 08:11 | She was like, "No, there's a reward for the cat," just blah, blah, blah. I don't know. You know what I mean, it's stupid. Then the cat ran-- it was never meant obviously no one's trying to hurt you or the cat. You know what I mean?                |
| JJ 08:24 | Right.                                                                                                                                                                                                                                              |
| DU 08:24 | Then once you guys started getting real upset about the cat and we didn't know where it was - I think they were afraid of a lawsuit or potential problems from corporate when you contacted corporate. So they just was like, "All right, deal with the lawyer and she'll go contact with you." |
| JJ 08:39 | When the cat left, because you say eight to ten days, so you obviously don't remember the exact day, which would be--                                                                                                                                 |
| DU 08:48 | Not exactly.                                                                                                                                                                                                                                        |
| JJ 08:49 | But, I mean--                                                                                                                                                                                                                                       |
| DU 08:50 | Sorry, hold on one second.                                                                                                                                                                                                                          |
| JJ 08:52 | Yeah.                                                                                                                                                                                                                                              |

|          | [silence]                                                                                                                                                                                                                       |
|----------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| DU 09:08 | I'm really sorry. The smoke alarm's going off in my room.                                                                                                                                                                        |
| JJ 09:10 | I'm sorry.                                                                                                                                                                                                                       |
| DU 09:12 | I thought it was a smoking room.                                                                                                                                                                                                 |
| JJ 09:13 | I didn't know-- what I'm curious about is, why did it--? whoops.                                                                                                                                                                 |
| DU 09:19 | I'm sorry. I'm in the bathroom.                                                                                                                                                                                                  |
| JJ 09:20 | Are you all right? Is it off?                                                                                                                                                                                                    |
| DU 09:24 | No, I'm in the bathroom now.                                                                                                                                                                                                     |
| JJ 09:26 | Mine always goes off when I take a shower.                                                                                                                                                                                       |
| DU 09:32 | Okay, so is there anything else I can answer, do you want to call me tomorrow, or is there anything else I can do for you?                                                                                                        |
| JJ 09:35 | I may give you a call tomorrow, yes sir. One last question is - when Kerri learned-- when you guys learned that the cat was gone, any idea why it took Marriott so long to get in contact with us?                                |
| DU 09:52 | No, I have no idea.                                                                                                                                                                                                              |
| JJ 09:54 | Did it take, do you--?                                                                                                                                                                                                           |
| DU 09:55 | I have no idea. I'm assuming that they wanted to try to find the cat, or I don't know.                                                                                                                                           |
| JJ 10:04 | Well, no one was trying to find the cat until I wrote to them.                                                                                                                                                                   |
| DU 10:08 | No, as soon as the cat was lost at our-- at first the cat was lost in our wall you got to realize, for like a week. It ended up in the wall, wouldn't come out, it didn't-- in the interior wall where the oil tank is. It hopped through by the heating vent, you know? |
| JJ 10:24 | Right.                                                                                                                                                                                                                           |
| DU 10:27 | So there was no way to get her out. I think she was pissing and shitting there for a week - it smells like cat urine in that house.                                                                                              |
| JJ 10:33 | Did Kerri ask anyone at Marriott, "Hey, maybe we need to get Cotton out of the wall?"                                                                                                                                            |
| DU 10:41 | We were trying to get her out, the problem is - I didn't tell my landlord that there was another cat there, which is why I told  Kerri not to bring the cat home because they wouldn't have liked us bringing another pet in without them knowing, and then it hopped in the wall. So I was angry, I said-- you know what I mean? |
| JJ 10:56 | Yeah.                                                                                                                                                                                                                            |
| DU 10:57 | Personally, I was the one  like, "Let's just see if she comes out and hope if she's in there she'll get hungry - she'll come out eventually." You                                                                                 |

|          | know what I mean? |
|----------|---|
| JJ 11:04 | Right. So what--? |
| DU 11:06 | [?] was sure she was in the wall. We thought maybe she'd sneaked out through the door when we ran back in, or something |
| JJ 11:11 | Well, I mean-- because I just didn't understand. I mean, that's a long time to not go and eat and drink, unless she was coming out at-- |
| DU 11:19 | Exactly, and then she got really hung up. We were getting worried. Honestly, I even-- I went into the wall, and I didn't get her. I ripped the wall open because, where the oil tank is-- she's hid up behind, it's low to the ground, so I couldn't even see her. She eventually came out on her own. |
| JJ 11:38 | God, this poor cat. |
| DU 11:40 | I [?] the wall out, it wasn't [?] to find her, she still stayed in [?]. You know what I mean? |
| JJ 11:46 | Yes. All right, well-- |
| DU 11:49 | She just burrowed herself in and got scared, you know. |
| JJ 11:52 | So, no idea - you haven't seen Cotton since? |
| DU 11:58 | Unfortunately no, when I get home tomorrow, I'll take a look around. |
| JJ 12:01 | Right. Well, I'll touch base with you-- what do you work at certain hours? |
| DU 12:10 | No, I don't work Monday. |
| JJ 12:12 | Okay. I'll give you-- |
| DU 12:15 | I'll talk to you soon. Let me deal with this fire alarm thing going off? |
| JJ 12:19 | All right. Thanks, Don. |
| DU 12:21 | All right. Bye bye. |

17